UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.: 05-10052-RCL |
| | ) | |
| JEREL A. LESLIE, | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S RESPONSE  TO  DEFENDANT'S MOTION
TO SUPPRESS EVIDENCE AND STATEMENTS[1]**

The United States of America, by and through its attorneys, United States Attorney

Michael J. Sullivan and Assistant United States Attorney Paul R. Moore, hereby respectfully

submits this Memorandum in opposition to defendant JEREL A. LESLIE's Motion to Suppress

Evidence and Statements.[2]

**Summary**

The defendant argues that the officers did not have a reasonable suspicion of criminal

activity which would justify an investigatory stop of the vehicle because there was no traffic

violation and the defendant was not engaged in any other inappropriate or unlawful activity.

Because the stop was not justified, the defendant argues, any evidence obtained as a result of that

stop should be excluded.

The government asserts that there was probable cause for stopping the automobile

---

[1]See "Attachment 1" (ATF Special Agent O'Hara's findings regarding the intersection and attached images of the area).

[2]In an effort to further illuminate previous state court findings on the issue, the Supreme Judicial Court's ruling on the Motion to Suppress is attached as "Attachment 2" (denying the Motion of state co-defendant Ralph Toussaint, who was a passenger in the front seat of the same vehicle and was found to be carrying a separate firearm on his person, although he was not federally-charged).

because the officers observed what they reasonably believed to be a traffic violation.[3]  In view of the objective circumstances, it was reasonable for the officers to believe that such a violation had occurred, and as a result, the stop was justified.  Once the initial stop was made, the officer's observations of the defendant's ducking motions and of parts of a concealed gun were grounds to heighten the investigation.

## Statement of Relevant Facts[4]

On December 18, 2004, at approximately 3:21 a.m., two Brockton police officers in a marked cruiser observed a white motor vehicle fail to stop at an intersection where the officers believed there was a stop sign (at the intersection of Pleasant Street and Oakdale Avenue). Officers followed the car as it turned right onto Pleasant Street and then left onto Nye Avenue. As the white vehicle turned to head south on Newbury Street, the officers activated the overhead blue lights on the marked police cruiser to effect a stop of the white vehicle, which they then pulled over (Ma. Reg. #56GB21 - Nissan Maxima).

Prior to exiting the police cruiser, one officer clearly observed the back seat passenger (later identified as the defendant) lean his body from the right side where he was sitting to the left in what appeared to the officer to be nearly a fully horizontal position as if to retrieve or conceal something.  That officer then walked up to the driver's side of the vehicle while the other officer walked up to the passenger's side of the vehicle.  By then, the same rear passenger was

---

[3]In response to the defendant's assertions in his Motion, the government's agent (see attached Affidavit 1) and one of the arresting police officers met for the purpose of inspecting the site of the civil traffic violation which had originally served as the basis for the stop.  Having so investigated, it is now clear to the government that no "stop sign" is currently in place at the intersection where the vehicle in which the defendant was riding as a passenger was stopped by the police.  Nor is there any "painted" stop sign on the street surface at the intersection.

[4]The government anticipates that the testimony given by police officers at the evidentiary hearing in this matter, to be scheduled, will support the facts asserted herein.

sitting upright.

     The officer on the driver's side then asked the driver for her identification and she provided it to him, although she stated that she had no registration for the car.  Hearing the officer on the other side of the vehicle talking to the passenger in the rear and saying "oh, you've done this before," the officer on the driver's side then shined his flashlight into the rear of the vehicle and could then see what he recognized as the butt and trigger guard of a firearm protruding from the floor on the driver's side of the rear passenger area of the vehicle.  That officer then signaled his finding to the other officer by holding up 4 fingers, at which point the second officer called for backup.

     The two officers continued to converse with the passengers of the vehicle in an attempt not to alarm them to their knowledge of the presence of the firearm until backup arrived.  Shortly thereafter, a backup officer arrived and approached the driver's side of the vehicle with his gun drawn as the officer who had previously been on that side of the vehicle approached the right passenger's side of the car.  At that point, that officer told the rear seat passenger that he was going to open the door and wanted that passenger to go directly to the ground outside of the vehicle, which he then did (following the guidance of the officer).  That passenger was secured (cuffed) and then the driver and front passenger were also cuffed (in order to secure them).  The officer then fully illuminated the rear passenger (floor) area and could clearly see that a gun was present on the floor and was closest to the rear passenger area (as opposed to the driver's area) and the barrel of the gun was pointing in a direction opposite where the rear passenger had been sitting (consistent with placing the weapon at such a location during his prior leaning motion).

     All three suspects were then arrested and brought to the police station for booking.

While the defendant was in the garage awaiting booking, an officer who was nearby observed him reach into his pocket and pull something out and thrown it into a nearby trash barrel.  That officer then notified another nearby officer, who then went to the barrel and found an empty .357 rounds shell casing (subsequently identified by the police firearms' expert as being identical to the rounds found in the gun (4 in count).  The defendant then told the officer who found it that he (Leslie) had just found the casing in the trash, had put it in his pocket, then was attempting to discard it.

## <u>Argument</u>

I.     <u>Police Officers had an Objectively Reasonable Basis for the Traffic Stop</u>

Law enforcement officers may permissibly stop an automobile and detain the driver where there is probable cause to believe a traffic violation has occurred.  *See Whren v. United States*, 517 U.S. 806, 810 (1996), *United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997).   In determining whether probable cause existed, the officer's subjective intent is irrelevant.  Instead, courts look to the "circumstances viewed objectively" to determine whether the action was justified.  *Whren,* 517 U.S. at 813, *see also United States v. Andrade*, 94 F.3d 9 (1st Cir. 1996).

In this case, there was an objectively reasonable basis to conclude that the vehicle in which the defendant was a passenger had violated a traffic law.  The vehicle came to an intersection of two streets that would normally involve a stop sign or painted stop line and the automobile's driver neglected to stop**.**  One of the streets - <u>actually a highway</u> - was known to the police officers to be quite busy with traffic most of the time, while the other (intersecting) street was considerably less busy and more of a "side street."  The officers also knew that other streets which similarly intersected the highway in the immediate vicinity were clearly marked with stop

signs and/or painted stop lines. They had every reason to believe that this street - paralleling almost precisely (in terms of traffic patterns) the other similarly situated streets - was marked by a stop sign or painted stop line as well.

An objective officer, viewing these circumstances in the position of the officers in this case, could therefore quite reasonably believe that the failure to stop was a violation of the traffic code.

Whether there was an actual violation of traffic laws is sometimes of not determinative in such circumstances, as long as the officer "reasonably believed it to be likely" that there was a violation. *United States v. Fox*, 393 F.3d 52, 59 n6 (1st Cir. 2004).[5]  In *Fox*, an officer was unable to determine whether the vehicle that he subsequently stopped was violating traffic laws by not having a working license plate light.  The court held that there was a "reasonable and articulable suspicion" that a violation was occurring or had occurred, since the officer knew that a working plate light was a requirement under the traffic laws, and it appeared to him that there was not a working license plate light on the automobile.  *Id.* at 59.  The fact that the owner of the automobile testified that the light was working shortly after "is of no consequence," since the stop was justified under the objective circumstances.  *Id.* at 59 n6.

Similar to the circumstances faced by the officer in *Fox*, the officers in this case knew it to be a violation of the laws to fail to stop at a stop sign or stop line, and from their observations of the automobile carrying the defendant, it was rational for them to stop the automobile for a

---

[5]The judgment in this case was vacated and remanded to the First Circuit by the Supreme Court for further consideration in light of *United States v. Booker*, 543 U.S. ---- (2005), a case decided on issues of sentencing.  *Fox v. U.S.*, 125 S.Ct. 2949, 162 L.Ed.2d 864 (2005).  It is expected that the law relating to automobile stops in the First Circuit's opinion will remain unchanged on remand.

failure to stop at an intersection where reasonably objective circumstances demonstrated that there was likely to be a stop sign or line and where they believed that there was, in fact, such a command to stop.

A number of courts draw a distinction between a mistake of law and a mistake of fact in assessing an officer's traffic stop when it turns out that no traffic law was violated. "Under this doctrine, '[a] traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment;'" "[b]ut 'if an officer makes a traffic stop based on a mistake of law, the stop violates the Fourth Amendment.'" *United States v. Rowell*, 2004 WL 555261 *4 (D.Mass. 2004), citing *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003), *United States v. Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000). The officers in this case were clearly not making a mistake of law, since it is indeed a traffic violation in the state of Massachusetts to fail to stop at a stop line or sign. If there is in fact no stop sign or line at the intersection in question, the officers may have made a mistake of fact, but this does not invalidate the traffic stop because the officers' assessment of the facts was reasonable. It was early in the morning, it was dark outside, and the intersection of the two streets was in a configuration where there was likely to be a stop sign (particularly given the fact that one of the streets is actually a highway).

The defendant's reliance on *United States v. Sugar*, 322 F.Supp.2d 85 (D.Mass. 2004) to argue that a traffic stop where there is no violation is unreasonable is misplaced. *Sugar* can readily be distinguished from the case at hand. That case involved an officer's mistake of law. The court held that the "one-time movement" of a trailer crossing the white line separating the shoulder from the road was in fact "not a violation of the ... statute" and therefore "the initial

stop was not reasonable or justified by probable cause." Here, there is no allegation that it is in fact not a violation of Massachusetts law to fail to stop at an intersection with a stop sign or stop line. The officers were correct in their knowledge of the law, unlike the officer in *Sugar*.

II.    The Officer's Observations of a Ducking Motion and Parts of a Weapon Justified the Scope of the Investigatory Stop

Occurrences after an officer stops an automobile may justify heightened investigation of a car and its occupants. *United States v. Chienn*, 266 F.3d 1, 6 (1st Cir. 2001); *Fox*, 393 F.3d at 59. "[W]hile an officer's actions must bear some relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees if is suspicions mount during the course of the detention." *Chienn*, 266 F.3d at 6.

Information developed in connection with a stop can give rise to grounds for a full custody arrest. *Bizier*, 111 F.3d at 218. In *Bizier*, the state troopers initially stopped a motorist for traveling ten miles over the speed limit, but upon their observations that it took Bizier longer than usual to pull over, his eyes appeared to be affected, he was swaying, and he and the passenger had inconsistent stories, the officers were justified in arresting him for driving under the influence. Similarly, in this case, the officers observed a ducking and reaching motion by the defendant following the stop of the vehicle, and they saw parts of a partially concealed weapon when they came to talk to the occupants of the car following the initial stop. It was, under those circumstances, reasonable for the officers to secure the occupants of the car and to perform a search of the vehicle.

A ducking motion, especially in light of other factors, can often form the basis for further investigation. "[S]louching, crouching, or any other arguably evasive movement, when combined with other factors particular to the defendant or his vehicle, can add up to reasonable

suspicion." *United States v. Woodrum,* 202 F.3d 1, 7 (1st Cir. 2000). In *Fox,* following the initial stop of the motorist, the officer noticed that the driver made "a ducking motion, as if 'reaching out for something under the seat or placing something under the seat.'" 393 F.3d at 56. That, in combination with the officer's past experience with Fox and a large bulge in Fox's pocket, was sufficient to justify a frisk of Fox leading to an arrest for possessing a concealed weapon. *Id.* at 59. The officer's observations of the ducking motion, in combination with the sight of a part of a gun, was enough to justify the officers' order to the defendant to exit the vehicle and the ensuing search.

## Conclusion

Under *Whren*, officers may stop an automobile where they have probable cause to believe a traffic violation has occurred. In this case, the objective circumstances, including the configuration of the intersection (where one of the streets was actually a highway and comparable surrounding intersections all had stop signs or painted stop lines), the time of morning, the lack of light, and the distance of the vehicle from the officers, provided a reasonable basis for the officers to conclude that a traffic violation had occurred. After the initial stop, the officer's observation of the defendant's unusual crouching movement and of a partially concealed gun in the automobile gave rise to justification for further investigation.

Based on the foregoing, the government respectfully requests that the defendant's Motion to Suppress Evidence and Statements be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:     /s/ Paul R. Moore
        Paul R. Moore
        Assistant United States Attorney

Date: October 19, 2005


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was served on October 19, 2005, via first class mail, to counsel for the defendant, Albert F. Cullen, Jr., as well as through electronic filing of this response to his pleading.

/s/ Paul R. Moore
Paul R. Moore
Assistant United States Attorney

Date: October 19, 2005

ATTACHMENT 1

<u>AFFIDAVIT OF SHEILA M. O'HARA</u>

I, Sheila M. O'Hara, being duly sworn, do state that:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and
Explosives ("ATF"). I have been an ATF Special Agent for over 18 years, and during
that time I have been involved in numerous investigations of violations of Federal
Firearms Laws. I am currently assigned to a group in the Boston Field Division of ATF
that, in part, works with other Federal, State and local police departments in and around
the Metropolitan Boston area to investigate and prosecute violations of Federal firearms,
explosives and controlled substance laws. I am the case agent assigned to investigate
defendant Jerel LESLIE ("LESLIE") for firearms violations.

2.      On December 18, 2004, at approximately 3:21 AM, Brockton Police Officers
Steve Johnson and Shawn Baker pulled a white Nissan Maxima, Massachusetts
registration 56GB21 over for failure to stop at the intersection of Oakdale Avenue and
Pleasant Street (Pleasant Street is also Route 27). Defendant LESLIE was the rear seat
passenger in the motor vehicle stopped by Officers Johnson and Baker. Officer Johnson
shined his flashlight in the rear passenger compartment and noticed the butt and trigger
guard of what appeared to be a firearm. Officers located a Ruger, model Blackhawk, .357
caliber revolver, serial number 33-33927 from under the driver seat with the handle
closest to defendant LESLIE in the backseat and with the barrel pointing away from
defendant LESLIE.

3.      On Monday, October 3, 2005, at approximately 3:50 PM, I went to the area of
Oakdale Avenue and Pleasant Street (Route 27), Brockton, Massachusetts to take pictures
of the intersection reported in Officer Johnson's police report. Oakdale Avenue stops at
the intersection of Colonial Terrace and Baxendale Terrace and does not actually
intersect with Pleasant Street (Route 27). Oakland Street is one street east of Oakdale
Avenue and intersects with Pleasant Street (Route 27). I called Officer Johnson to
confirm the location of where the reported motor vehicle violation took place. He advised
that he was on patrol at the time and could come by and show me the intersection in
person.

4.      Approximately 10-15 minutes later Officer Johnson arrived at the intersection of
Oakland Street and Baxendale Terrace where I was waiting for him. Officer Johnson

advised that the motor vehicle violation took place at the intersection of Oakland Street and Pleasant Street (Route 27), not Oakdale Avenue (actually Colonial Terrace) and Pleasant Street (Route 27) as his report indicates. There was no stop sign or stop line at the intersection of Oakland Street and Pleasant Street (Route 27). There is a stop line at the intersection of Colonial Terrace and Pleasant Street (Route 27).

5.      While I was waiting for Officer Johnson to arrive and after he left, I was in a position to observe the intersection of Oakland Street and Pleasant Street (Route 27). A couple of cars drove down Oakland Street toward Pleasant Street (Route 27) and came to a stop at the intersection before turning on to Pleasant Street (Route 27).

6.      I drove around the area and observed that almost all streets that intersected with Pleasant Street (Route 27) had either stop signs, stop lines or both. Pleasant Street (Route 27) is one of the major routes into the City of Brockton and is usually busy with motor vehicle traffic. Oakland Street is a small dead-end street with a small number of homes (approximately 5) on it and did not appear to have much motor vehicle traffic on it. I parked my car at the corner of Glenwood Street and Pleasant Street (Route 27) and observed the intersection until approximately 5:00 PM. Every vehicle that came to the intersection stopped prior to turning on to Pleasant Street (Route 27). In addition, the intersection of Glenwood Street and Pleasant Street (Route 27) did not have a stop sign or stop line. Every car that came to that intersection also stopped prior to turning on to Pleasant Street (Route 27).

/s/ Sheila M. O'Hara

Sheila M. O'Hara
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Date:  October 19, 2005







# ATTACHMENT 2

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

SUFFOLK, ss.                          SINGLE JUSTICE NO.2005-0122

COMMONWEALTH

v.

RALPH TOUSSAINT

## FINDINGS OF FACT AND CONCLUSIONS OF LAW MADE ORALLY BY THE MOTION JUDGE (DINNEEN, J.) IN BROCKTON DISTRICT COURT

I find that Officer Johnson, who was a Brockton Police Officer, was patrolling at approximately 3:21 a.m. in the morning, and he observes a motor vehicle come out of a side street onto a main street that he, that the officer is on. The officer believes there is a stop sign at that intersection and it's obvious from seeing the motor vehicle roll through the stop sign at fifteen miles an hour, it's obvious to him that it didn't stop at that stop sign. He says he's two hundred (200) feet away. There is an estimate by the other witnesses that the distances would be somewhat greater. But that's an estimate, just as the officer's is an estimate.

The officer says that he sees the car go briefly down, continue down Pleasant Street and take a left onto Nye Ave. As the officers sees this he is just before the intersection of Pleasant and Spring Street which is basically a fork in the road and so the officer takes a left on the fork to cut the automobile off. He drives down; he says he loses sight of the car for a couple second or two. That's probably not completely accurate. It's probably longer than that. But he arrives at the intersection where Nye Ave., the car on to which the suspect [sic], the street on to which the suspect vehicle turned, intersects with Spring. He sees the car, a car that looks the same to him; that is, a white mid-sized car,

on a night when there are no other cars out on the road. He observed the area. He sees
that car coming down Nye Ave towards Spring, turn onto Spring, come towards the
cruiser, then turn onto Newbury Street. The officer's cruiser then pulls in behind the
suspect vehicle and signals the vehicle to stop. The vehicle pulls to a stop. He responds to
the officer's lights.

 The officer walks up to the motor vehicle. There are two officers actually in this
car at the time, Officer Johnson and his partner. Officer Johnson is the one who goes up
to the driver's window, asks for the license and registration from the operator. The
operator, who is not one of the defendants here, tenders a license but cannot tender a
registration. While the officer is talking to the operator-- right before the stop I should
say, the officer observes the back seat passenger lean over, far over to the left and then sit
back upright-- as the officer is talking to the operator, he shines his light on to the floor of
the backseat, sees the butt of the gun and the trigger guard of the gun, signals to his
partner. They then call for backup and take all three occupants in the motor vehicle, the
driver, who is not a defendant, and the two defendants here, one who is the right front
passenger seat, one who is the right rear passenger seat.

 They take all of them out, cuff them and search them. They find a handgun on the
right front passenger and retrieve the handgun which the officer observed on the floor of
the car. The officer cites the operator and eventually releases her.  The two defendants
are being charged with possession of firearms that were discovered in the search.

 I think clearly there was a stop without a warrant and the burden is on the
government to show that that stop was authorized. I think the standard is whether or not
the officer had reasonable and articulable suspicion that there was a crime or a civil

motor vehicle which had been or was about to be committed. And I find that the officer,
that the stop meets that.

I think that the officer had a reasonable and articulable suspicion  that the motor
vehicle had gone through a stop sign. And the choice to head the vehicle off as opposed
to follow it down the street is I think the more appropriate one. I think it's a reasonable
one for a police officer to take (maybe lawyers wouldn't) but the police officer took the,
made the choice to head the vehicle off.  The test is not beyond a reasonable doubt
[inaudible] car and even if the officer is mistaken as to whether or not there's a stop sign
there. That's not... I find that he had a reasonable, reasonable feeling that there was a,
that there was a stop sign in that area, that he's familiar with the area; he thought there
was a stop sign there.

There's one case that bears on this type of situation and that's-- I think it was a
case from the Lowell area-- where a police officer stops a car coming down what he
thought was a one-way street. Turned out that, that was not a one-way street, so the car
was not committing a violation. In the court there was a lot of discussion-- I think the law
issue should have been whether or not the officer had a good faith basis to feel if the car
was committing a violation. The court in this particular case found that the stop was not
appropriate. But they--and they found that for a very particular reason.  They said this
particular officer, his duties entail keeping track of all these different traffic [inaudible],
track of all these different regulations and these one-way streets. So in that particular
situation, they said they were going to hold him to a higher standard. But the clear
implication of the case is that the officers don't need to be a hundred.percent correct. If
they have a good faith basis to feel that there was a violation, they can make the stop.

I think that's what applies here. I think the officer did have a good faith basis to feel that the motor vehicle went through a stop sign and he had a right to stop the motor vehicle. As he came up to the car, shined his flashlight in the back, saw the gun— that's not a search, the cases have indicated pretty clearly--that's not a search. He saw the gun. I think that was reasonable to take the parties out, secure the guns, then make inquiries as to whether or not those guns were legal or illegal. So I think that the officer in terms of the stop, I found it's appropriate. In terms of the exit order, I find that once the officer saw the handgun on the floor of the back seat, particularly after one of the occupants had made this movement of lying down as soon as the police started to stop the car. That provided a basis for him to secure the weapons and then talk about it afterwards and provided basis for them to take the occupants out first, secure the weapon and then discuss whether or not there was a permit involved. So for those reasons, I find that the stop was appropriate; the exit order was appropriate and the search and the discovery of the guns was appropriate.

The motion is denied.

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

SUFFOLK, ss.                          SINGLE JUSTICE NO.2005-0122

COMMONWEALTH

v.

RALPH TOUSSAINT

AFFIDAVIT OF COUNSEL

I, Jason V. Fox, hereby depose as follows:

1.    The foregoing transcription of Judge Dinneen's findings of fact has been
      compared to the tape and is as accurate as I can make it.
2.    Following the court's denial of my motion for written findings, I obtained the
      tapes from the court and submitted them to a transcriptionist to produce a duly
      certified transcript of the hearing.
3.    The transcriptionist in question was recommended to me by another attorney and I
      believed her to be properly certified and qualified to perform the work.
4.    The transcriptionist in question produced a transcript that did not meet
      professional standards and could not be certified as accurate.
5.    Accordingly for the purposes of this application I am submitting the foregoing
      transcript together with this affidavit for the Single Justice's consideration.

Signed under the penalties of perjury this 28th day of July, 2005.

_____
Jason V. Fox

## COMMONWEALTH OF MASSACHUSETTS
### SUPREME JUDICIAL COURT

SUFFOLK, ss.

SINGLE JUSTICE NO.2005-0122

#### COMMONWEALTH

v.

#### RALPH TOUSSAINT

### CERTIFICATE OF SERVICE

I, Jason V. Fox, certify that I have served a true copy of Defendant's Application for Leave to Appeal the Denial of his Motion to Suppress Evidence by regular mail, postage prepaid, on counsel for the Commonwealth:

Suzanne Dunleavy, Esq.
Assistant District Attorney
32 Belmont Street
P.O. Box 1665
Brockton, MA 02303

Telephone: 508-584-8120

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY this 28th day of July, 2005.

Jason V. Fox
BBO# 638306